IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 13, 2009

## STATE OF TENNESSEE v. TIWON ANTON HARVELL

**Appeal from the Criminal Court for Davidson County**
**No. 2006-B-1726    Mark J. Fishburn, Judge**

---

**No. M2007-02687-CCA-R3-CD - Filed February 23, 2009**

---

The Defendant, Tiwon Anton Harvell, was convicted of one count of attempted second degree murder and one count of unlawful possession of a weapon. He was sentenced as a Range I, Standard offender to fourteen years in the Department of Correction. In this direct appeal, he contends that (1) the State produced evidence insufficient to convict him of either charge beyond a reasonable doubt; and (2) the trial court erred in sentencing him. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Michael Colavecchio, Nashville, Tennessee, for the appellant, Tiwon Anton Harvell.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kathy Morante, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

The events underlying this case began on February 11, 2006. Mapco Express ("Mapco") District Manager Paul Klinger, whose duties included oversight of ten to fifteen different Mapco stores, arrived between 11:15 and 11:30 that evening at the 3043 Nolensville Road Mapco store in Nashville. He testified that he planned to help store manager Carolyn Jackson and third-shift clerk David Browning prepare the store for a visit from some of the company's "top dogs" scheduled for the next day. Shortly after he arrived, he began to break down cardboard boxes and help Jackson clean the store's cooler and stock it for the next day.

At that time, Klinger heard a young female customer talking to Browning at the store's cash register. He walked closer to observe. The customer left after buying a bottle of beer. She came back in shortly thereafter, however, claiming that she had broken the bottle of beer and asking for a free replacement. Browning declined to give her one. Klinger then noticed the customer repeatedly glancing at a car outside as if communicating with someone therein. She then left the register area and began wandering around the store.

Klinger decided to take some broken-down boxes outside to the dumpster. As he walked out of the store, he looked toward the car at which the female customer had glanced. Klinger noticed a man sitting on the passenger seat with the door open. He did not get a good look at the man's face at that time. The man threw some items of trash on the ground next to the car. As Klinger passed the car, he politely asked the man to use a nearby trash can. The man yelled at him in response, calling him a "white honkey" and a "cracker."

Klinger was about fifteen feet from the car when this name-calling started. He turned around and said, "All I was trying to get you to do was get you to put trash in the trash can." The man then got out of the car, put his hand in his pocket, pulled out a pistol, and fired a shot at Klinger. The bullet missed. Klinger froze, still carrying a number of broken-down boxes in his arms, and got his first clear look at the man, who he identified as the Defendant at trial with "no doubt in [his] mind." He had never seen the Defendant before. The Defendant wore a white "Kangaroo" hat with a narrow bill all the way around it. The State showed Klinger a picture of a white hat recovered later by police; Klinger confirmed that the picture showed a hat identical to the one the Defendant had worn.

The Defendant fired again. This bullet hit Klinger in the lower right portion of his abdomen. Klinger fell to the ground, feeling "like it was something in [his] hip or [his] leg was broken." The Defendant then walked over to Klinger and started beating him on the head with the pistol. Klinger heard clicking sounds that he believed came from the pistol, but he did not hear any additional accompanying shots, and could not say whether the pistol had misfired or run out of ammunition. Klinger also could not say whether the Defendant was pointing the pistol at him when he heard the clicking sounds. Klinger tried to block further blows to his face; the Defendant then stood up and kicked him on his neck and the back of his head.

After that, Klinger remembered very little. He heard someone yell, "Call 911!" He also remembered paramedics placing him into an ambulance and taking him to the hospital. Klinger identified a number of photographs of the crime scene. He also described his injuries and noted the continuing physical and emotional difficulties he experienced as a result.

Carolyn Jackson, the manager of the Mapco store in question, also testified. She began her shift at 7:00 or 8:00 p.m. on February 11, 2006. She had asked Klinger to come by that evening and help in the store. Jackson confirmed that Browning was also present, working as a clerk. Jackson saw a "white female" customer come into the store and buy beer and cigarettes from Browning. Jackson then went to do some work at Jackson's desk in the back of the store. A few minutes later she heard "loud noises" from outside the store. Browning ran to her desk, told her that Klinger had

been shot, and asked her to "come help." Jackson and Browning ran back to the front of the store. Browning left the store through the front door; Jackson hit the store's silent alarm, locking herself and the female customer inside.

Shortly thereafter a "gunman," who Jackson identified as the Defendant at trial, came to the door, pointed the gun at Jackson, and told her to "let [the female customer] out." The Defendant wore a "white, fuzzy-looking hat." Jackson also identified this hat using the same picture the State had showed Klinger.

Jackson, wanting to prevent further violence, opened the door. The Defendant and the female customer left together in a car. The female customer drove and the Defendant rode in the passenger seat. Jackson called 911 on her cell phone. She then went outside into the Mapco parking lot. She saw a lot of blood coming from Klinger's head and retrieved some towels from inside.

David Browning also testified. His February 11, 2006 shift began at 11:00 p.m. Klinger and Jackson were in the store with him that evening. After a woman bought beer from him, he went outside to have a cigarette. Afterwards, he returned to the cash register. A few minutes later he heard what he believed to be a gunshot; he heard the sound again immediately thereafter. He grabbed "a stick" and ran outside, where he saw Klinger laying on the ground. He ran back inside toward Jackson's desk. On the way, he saw that the woman to whom he had sold beer was still in the store. Browning gave the stick to Jackson and told her to lock the doors and call the police. He then ran back outside.

Browning saw a man hunched over Klinger and heard Klinger saying, "Please don't, I'm sorry," as the man hit him. Browning, who identified the man as the Defendant at trial, said he had seen the Defendant and the female customer sitting in a car in the Mapco parking lot on a few previous occasions. He had become suspicious of them as a result.

Browning put his hand on the Defendant and pushed him off of Klinger. The Defendant returned to his car without saying anything. Browning tried to move Klinger, but Klinger objected. Jackson then let Browning back into the store, at which point the Defendant approached the door and ordered that the woman inside be released. Browning opened the door and let her out. He also confirmed that the Defendant wore a white, fuzzy hat like the one in the State's picture. Finally, Browning testified that he gave a description of the Defendant's vehicle, as well as its tag number, to the police when they arrived.

Detective Brian Murphy of the Metro Nashville Police Department also testified. He heard a "shooting call" go out while driving through his area on the night of February 11, 2006. The call included a description of a vehicle, as well as its tag number. Detective Murphy ran the tag number; it was registered to a "female subject" at an address approximately one mile from the Mapco store where the shooting had taken place. Detective Murphy immediately drove to the apartment complex at that address. As he pulled into the complex parking lot, he saw a vehicle matching the description he had heard over the radio. Detective Murphy parked his vehicle. He then saw a white female and

a black male in a "big white fuzzy hat" walking between two cars on the opposite side of the parking lot.

Detective Murphy exited his vehicle. The black male ducked down between the two cars and "seemed to vanish." Detective Murphy then requested, over the radio, a description of the suspect. It matched the man he had seen. Detective Murphy then ran to where he had seen the man and tried to guess where the man might have gone. Detective Murphy ran to the end of the nearby apartment building. He then turned right and ran back into the center of the complex. Someone then told him that an individual had been seen running away "on the other side of the playground by the A and B buildings." Detective Murphy recalled that the apartment number returned on the vehicle's tag was located in the complex's A building; he went to that apartment and waited for other law enforcement units to arrive.

Detective Murphy and other law enforcement personnel entered the apartment about fifteen to thirty minutes after Det. Murphy saw the man and woman in the parking lot. He found the Defendant, who had apparently changed clothes. Detective Murphy found a white, fuzzy hat in the hall closet. He also found, in the master bedroom closet, a pair of bloody shoes matching a previously obtained description of Klinger's assailant's shoes. Finally, he found a bloody t-shirt in the kitchen trash can.

Detective Mark Anderson of the Metro Nashville Police Department also testified. He arrived at the apartment after running the tag number reported over the radio. A white female gave him permission to enter. Based on a conversation with this white female, he searched the apartment complex's playground for the gun used in the Mapco shooting. He was unable to find a gun. Detective Anderson arrested the Defendant, noting some spots of blood on the Defendant's pants.

As its last witness, the State presented Doctor Jose Diaz, a trauma surgeon at Vanderbilt University Medical Center. He testified that he was working in the Vanderbilt Emergency Room on the evening of February 11 to 12, 2006. He examined Klinger upon his arrival at the hospital, noting a ballistic injury to Klinger's abdominal cavity and blunt trauma to his face. He immediately performed an operation on Klinger, who had "potentially significantly life-threatening" wounds. Dr. Diaz said that he performed a second surgery on Klinger at a later time to repair an abdominal hernia. Klinger remains at an elevated risk for further hernias, and he may not regain feeling in a substantial portion of his right leg.

The State then rested its case. The Defendant moved for acquittal on the charge of attempted first degree murder, arguing that the State had presented no evidence of premeditation. The trial court denied this motion.

The Defendant then chose to testify. He said that he started drinking when he woke up "sometime in the afternoon" on February 11, 2006. He drank all day and took some Lortab pills because he "wanted to be high" to escape the pain of his mother's September 1, 2005 death. He

remembered pulling the trigger on his gun on the evening of February 11. Because he was high, however, he could not remember anything else that happened at the Mapco. He remembered being arrested and remembered waking up in jail the following day. He was not out to hurt anyone that evening and carried his gun "for protection."

He admitted that his girlfriend, the white female with him at the Mapco, later told him that he had "ditched" his gun on the playground in her apartment complex. He agreed that would be a smart thing to do after a shooting.

The jury convicted the Defendant of one count of attempted second degree murder and one count of illegal possession of a weapon. He now appeals.

## Analysis

### I. Sufficiency of the Evidence

The Defendant first challenges the sufficiency of the evidence used to convict him. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

A person commits criminal attempt when, acting with the culpability otherwise required for an offense, he "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-

12-101(a)(2). Second degree murder is "a knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(2). Further, it is an offense for a person who has been convicted of a felony drug offense to possess a handgun. Tenn. Code Ann. §39-17-1307(b)(1)(B).

The Defendant's sole argument is that no witness identified him as Paul Klinger's assailant. He supports this argument by correctly noting that neither Jackson or Browning saw him shoot Klinger. He also claims that Klinger did not identify him at trial.

In identifying the Defendant as the person they had seen in the Mapco parking lot on February 11, 2006, both Jackson and Browning pointed out the person in the courtroom wearing a blue shirt and a yellow tie. In both instances, the State asked that the record reflect that Jackson and Browning had identified the Defendant. Klinger also identified as his assailant the person in the courtroom wearing a blue shirt and a yellow tie. The State neglected, however, to request that the record reflect that Klinger had identified the Defendant.

The Defendant apparently argues that Klinger therefore failed to identify him. We disagree. It is quite clear from the record that Klinger identified the Defendant as his assailant, rather than some other person in the courtroom wearing a blue shirt and a yellow tie. This issue is without merit.

**II. Sentencing**
The Defendant was sentenced as a Range I, standard offender to the maximum sentence on both counts—twelve years for attempted second degree murder and two years for unlawful possession of a weapon. The trial court ordered him to serve his sentences consecutively, for a total effective sentence of fourteen years in the Department of Correction.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement

and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

The Defendant's conduct occurred subsequent to the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Carter, 254 S.W.3d at 345.

The presentence report reflects that the Defendant was twenty-six years old and unmarried at the time of his September 7, 2007 sentencing hearing. It also shows seven previous misdemeanor

convictions, and one previous felony conviction. The Defendant reported that he had completed the eleventh grade but had not received a high school diploma or a GED. He reported no employment history. The Defendant had a history of abusing drugs and alcohol, but he was otherwise in good physical and mental health.

In considering whether to enhance Defendant's sentence, the trial court found that no mitigating factors were applicable under Tennessee Code Annotated section 40-35-113. It found a number of enhancement factors applicable, however, including Tennessee Code Annotated sections 40-35-114(1), (3), (5), (6), and (9). The Defendant challenges only the applicability of section 40-35-114(3), which authorizes enhancement upon a finding that a defendant's "offense involved more than one (1) victim." The State contended at sentencing, and the trial court agreed, that the Defendant's conduct involved more than one victim because he pointed his gun at Jackson and Browning when he demanded that his girlfriend be released from the Mapco.

We need not decide whether the trial court incorrectly applied this enhancement factor. The remaining enhancement factors it found were more than sufficient to support the Defendant's sentence. This issue is without merit.

**Conclusion**

Based on the foregoing authorities and reasoning, we affirm the Defendant's convictions and sentence.

_____
DAVID H. WELLES, JUDGE